IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| In re: | ) | Chapter 11 |
|---|---|---|
| | ) | |
| | ) | Case Numbers |
| AUTO MASTERS, LLC; | ) | 3:17-bk-07036 |
| AMC FINANCE, LLC; | ) | 3:17-bk-07038 |
| AMERICA'S UNITED FINANCIAL, LLC; | ) | 3:17-bk-07041 |
| CAPITAL PARTNERS, LLC; | ) | 3:17-bk-07042 |
| AUTO MASTERS OF CLARKSVILLE, LLC; | ) | 3:17-bk-07045 |
| DIRECT AUTO FINANCE, LLC; | ) | 3:17-bk-07046 |
| AUTO MASTERS OF FRANKLIN, LLC; | ) | 3:17-bk-07047 |
| AUTO MASTERS OF HERMITAGE, LLC; | ) | 3:17-bk-07048 |
| AUTO MASTERS OF MADISON, LLC; | ) | 3:17-bk-07049 |
| AUTO MASTERS OF NASHVILLE, LLC; | ) | 3:17-bk-07050 |
| ONE SOURCE FINANCIAL, LLC; | ) | 3:17-bk-07051 |
| AUTO MASTERS SALES & SERVICE, INC.; | ) | 3:17-bk-07052 |
| SOUTHEAST FINANCIAL, LLC; | ) | 3:17-bk-07053 |
| AUTO MASTERS OF SMYRNA, LLC; and | ) | 3:17-bk-07054 |
| AUTO MASTERS OF WEST NASHVILLE, LLC. | ) | 3:17-bk-07055 |
| | ) | |
| Debtors. | ) | |

## COMPANY PROFILE

The above-captioned debtors (the "Debtors") file this statement of their company profile[1] in support of motions to be filed in this case. To avoid unnecessarily lengthy motions that recite the Debtors' profile and background, the Debtors intend to reference and incorporate this company profile in current and future motions.

The Debtors are a series of "buy here, pay here" automobile dealerships ("BHPH") in middle Tennessee and their related finance companies. Each of the Debtors are owned either partially or wholly by Mark Janbakhsh. Mr. Janbakhsh bought the first dealership from his father

---

[1] The Debtors expressly reserve their right to supplement and amend this profile. It is based on information available to counsel at the time of filing.

after college, and through his and his family's hard work, he has built a series of companies that comprise the largest collection of BHPH car dealerships in middle Tennessee.

The Debtors collectively employ more than one hundred people, most of which depend on the Debtors as their sole source of income. The Debtors also serve a valuable niche market. Many of the Debtors' customers face credit challenges, and they either have been or would be turned down for traditional vehicle financing. Without the means to buy a vehicle, many of these people are unable to work or most effectively provide for their families. Through their years of business, the Debtors have taken a different path than other BHPH lenders. Other such lenders have poor reputations for low-quality, high mileage vehicles. These vehicles can often be fraught with salvaged titles, rebuilt titles, poor Carfax reports, disrepair, and overall reliability issues. Other BHPH lots do this because problem vehicles can be purchased at an auction for often times nominal amounts, thereby increasing profit margin.

The Debtors have taken a completely different approach. The Debtors' approach is much more long-term thinking, geared to obtain repeat customers and parallel the service provided by the traditional branded dealerships. For example, instead of poorly maintained caged lots, the Debtors maintain clean, modern, and either new or relatively new facilities. Customers are welcomed to a comfortable lounge area with television and wi-fi, and refreshments are always available. In addition, the Debtors have age and mileage cutoffs and offer warranties, all to provide their customers with peace of mind when the vehicle is relied upon. The Debtors refuse to be lumped in with other BHPH lenders and, as part of their business model, make a daily effort to be a reputation-driven company. Word of mouth and customer referrals are an overwhelmingly important component to the Debtors' revenues and profitability.

The Debtors' have effected change within Middle Tennessee. Customers now realize that they can obtain quality cars and brand-dealership service even if their credit scores are lower than desired. Many of middle Tennessee's most marginalized citizens would be left with two options: (a) have no vehicle—and deal with all of the associated hardships; or (b) buy a lower quality vehicle without a warranty from a less reputable BHPH dealership. It is in the public interest to keep the Debtors operating.

## OWNERSHIP STRUCTURE

Each dealership is a separate LLC. Mr. Janbakhsh owns, at the very least, a majority stake in each of these LLCs. Each dealership also has a corresponding "related finance company" ("RFC") that purchases and holds the receivable rights and chattel paper from all car sales. A summary of each Debtor entity is set forth below.

   a. **Auto Masters, LLC ("AM"); America's United Financial, LLC ("AUF")**

AM is the largest of the dealerships bearing the "Auto Masters" mark. It is located at 4601 Nolensville Pike, Nashville, TN 37211. AM currently has 35 employees, and Mr. Janbakhsh is its sole owner. AUF is AM's related finance company. As discussed herein, AUF purchases the commercial paper generated from AM's self-financed vehicle sales and collects the receivables generated therefrom. Mr. Janbakhsh is also the sole owner of AUF.

   b. **Auto Masters of Nashville, LLC ("AM Nashville"); Once Source Financial, LLC ("One Source")**

AM Nashville is a BHPH dealership located at 609 Thompson Lane, Nashville, TN 37204. Mr. Janbakhsh owns 51% of AM Nashville. The remaining 49% is owned by Mr. Janbakhsh's brother-in-law, Carlos Griffin. One Source is the RFC for AM Nashville. It purchases the commercial paper generated from AM Nashville's self-financed vehicle sales. Mr. Janbakhsh owns 51% of One Source, with Mr. Griffin owning the remaining 49%.

3

c. **Auto Masters of Franklin, LLC ("AM Franklin"); Direct Auto Finance, LLC ("Direct Auto")**

AM Franklin is a BHPH dealership located at 1900 Columbia Avenue, Franklin, TN 37067. Mr. Janbakhsh owns 51% of AM Franklin. The remaining 49% is owned by Mr. Janbakhsh's uncle, Mehdi Khaila. Direct Auto is the RFC for AM Franklin. It purchases the commercial paper generated from AM Franklin's self-financed vehicle sales. Mr. Janbakhsh owns 51% of Direct Auto, with Mr. Khaila owning the remaining 49%.

d. **Auto Masters of Clarksville, LLC ("AM Clarksville"); AMC Finance, LLC ("AMC")**

AM Clarksville is a BHPH dealership located at 997 South Riverside Drive, Clarksville, TN 37040. Mr. Janbakhsh owns 51% of AM Clarksville. The remaining 49% is owned by Mr. Janbakhsh's uncle, Jamal Pahlevani. AMC is the RFC for AM Clarksville. It purchases the commercial paper generated from AM Clarksville's self-financed vehicle sales. Mr. Janbakhsh owns 51% of AMC, with Mr. Pahlevani owning the remaining 49%.

e. **Auto Masters of Hermitage, LLC ("AM Hermitage"); Capital Partners, LLC ("Capital Partners")**

AM Hermitage is a BHPH dealership located at 2610 Lebanon Pike, Nashville, TN 37214. Mr. Janbakhsh owns 51% of AM Hermitage. The remaining 49% is owned by Mr. Janbakhsh's friend and business associate, Ciprian Gradinaru. Capital Partners is the RFC for AM Hermitage. It purchases the commercial paper generated from AM Hermitage's self-financed vehicle sales. Mr. Janbakhsh owns 51% of Capital Partners, with Mr. Gradinaru owning the remaining 49%.

f. **Auto Masters of Smyrna, LLC ("AM Smyrna"); Auto Masters of Madison, LLC ("AM Madison"); Auto Masters of West Nashville, LLC ("AM West"); Southeast Financial, LLC ("SEFI").**

AM Smyrna is a BHPH dealership located at 56 S. Lowry Street, Smyrna, TN 37167. AM Madison is a BHPH dealership located at 712 Gallatin Pike, Madison, TN 37115. AM West is a

BHPH dealership located at 5501 Charlotte Pike, Nashville, TN 37209. Mr. Janbakhsh owns 51% of AM Smyrna, AM Madison, and AM Nashville. The remaining 49% of each entity is owned by Mr. Janbakhsh's relative, Mehran Janbakhsh. SEFI is the RFC for AM Smyrna, AM Madison, and AM West. It purchases the commercial paper generated from the self-financed vehicle sales of these dealerships. Mark Janbakhsh owns 51% of SEFI, with Mehran Janbakhsh owning the remaining 49%.

      g. **Auto Master Sales & Service, Inc. ("AMSS")**

AMSS is a formerly operating BHPH dealership that is solely owned by Mr. Janbakhsh. AMSS no longer operates as a dealership. It is used only to "refloor" repossessed vehicles in the process described below. Its only income comes from "reflooring" inventory, and its only expenses are payment to certain floorplan lenders.

## HISTORICAL BUSINESS MODEL

Prior to 2011, the business model of each dealership was typical for BHPH car dealerships. Each dealership had a lending relationship with a lender who would finance the inventory of vehicles to be stored on a given dealership's lot (a "Floorplan Lender"). Not all dealerships used the same Floorplan Lender, and some had relationships with multiple Floorplan Lenders. According to the loan terms, the Floorplan Lenders would give the dealerships a line of credit through which they could purchase vehicle inventory at auction and place the vehicles on their lot for sale. The dealerships would then pay interest on the amount advanced at an agreed upon interest rate. As security for this line of credit, the Floorplan Lender would retain a first priority purchase money security interest in the given dealership's inventory and would hold the original certificate of title. Upon the sale of any vehicle, the dealership was required to pay the Floorplan

5

Lender the amount advanced for that particular vehicle within two to five days, depending on the specific loan agreement (the "Floorplan Payoff").

As BHPH dealerships, the Debtors' customers did not have financing from third-party sources. Instead, they relied on the dealership to finance them. Accordingly, when customers would purchase a vehicle, they would execute a Retail Installment Contract and Security Agreement (a "Contract"). This Contract would require a down payment, then it would provide a monthly payment schedule with interest until the vehicle was paid off. The respective dealership would then use its operating capital to fund the Floorplan Payoff. After receiving the Floorplan Payoff, the Floorplan Lender would release its lien on the given vehicle's title, though it would retain a lien on the proceeds generated therefrom. The dealership would then sell the Contract—which constituted chattel paper under Article 9 of the Uniform Commercial Code (the "UCC")—to its RFC to hold. The dealership would then act as the collecting agent for the receivables owed to the RFC.

In the event of a default by a customer, the RFC would order a repossession of the vehicle, by and through its related dealership. The RFC would then send the notice required by Article 9 of the UCC to the customer informing of the RFC's intent to dispose of the collateral. After the requisite notice period, the RFC would sell the vehicle back to the dealership at a commercially reasonable, market-tested wholesale (the Manheim Market Report value, hereafter referred to as the "MMR Value"). The dealership would then place the vehicle back on its lot for resale. Upon placing the vehicle on the lot, the dealership would then "refloor" the vehicle, meaning it would deliver the title back to the Floorplan Lender in exchange for payment from the Floorplan Lender to the dealership of the vehicle's MMR Value. The refloored vehicle would then serve as additional security for the line of credit.

6

The sales of commercial paper to the RFC, and the collection of receivables by the dealerships did not always result in a contemporaneous payment. Instead, the dealerships and the RFCs would resolve their mutual debts through a month-end "true up." At the end of each month, the dealership would determine the amounts that it owed to the RFC for (a) amounts collected on the commercial paper, and (b) vehicles purchased post-repossession at MMR Value. It would then determine the amount that the RFC owed to it for commercial paper sales. Finally, it would true-up the accounting and either pay the RFC the amount that it owed, or demand payment from the RFC for the amount owed therefrom.

## BUSINESS MODEL AFTER 2011

The business model prior to 2011 was profitable and sustainable, but it had limited growth potential. Though the dealerships had no trouble selling cars, they were limited in the number of cars they could self-finance through their own operating capital. Accordingly, in 2011, Mr. Janbakhsh entered an agreement with Capital One Bank National Association ("Capital One") on behalf of AM, AUF, and AMSS for a $15,000,000.00 line of credit to be secured on the borrowers' commercial paper (the "Capital One Line"). By using this line of credit, AM could sell cars and fund the Floorplan Payoff without tapping into its cash reserves. Instead, it could draw on the Capital One Line to fund the difference between the customer's down payment and the Floorplan Payoff, then remit the entire Floorplan Payoff to the Floorplan Lender. By minimizing the use of operating capital to finance the Floorplan Payoff, AM was able to dramatically increase the volume of cars that it could finance while retaining is proven business model of using floorplan lenders to stock inventory.

The Capital One Line was secured on the Contracts generated from the vehicle sales. Because the Floorplan Lender had a blanket lien that would encumber this commercial paper,

7

Capital One reached intercreditor agreements with each of the Floorplan Lenders that would grant Capital One a priority lien in all commercial paper generated from the sale of any vehicle if the Floorplan Lender had received the corresponding Floorplan Payoff.

The Capital One Line was an interest-only line of credit. Though the maximum indebtedness was $15M, AM was required to maintain a principal balance that was not greater than sixty percent (60%) of the amounts due to AM or AUF on their portfolio of consumer paper. AM and AUF would then make interest-only payments each month depending on the amount outstanding on the Capital One Line.

Through the liquidity provided by the Capital One Line, Mr. Janbakhsh was able to scale his successful BHPH dealership operation dramatically. As he and his business partners opened additional dealerships, he sought to provide them with access to the Capital One Line. Accordingly, over the past several years, the Capital One Line and the associated agreements have been amended to (a) increase the maximum principal indebtedness to account for the increased sales volume in the various dealerships, and (b) add the other dealerships and RFCs as borrowers under the loan documents.

In 2015, the Capital One Line was amended again to provide for a loan syndication with First Tennessee Bank ("FTB"). Under this amendment, FTB would advance $10M on a line of credit (the "FTB Line"). This advance was consolidated as part of the Capital One Line, with Capital One acting as the administrative agent under the syndicated loan agreement. Under this modified agreement, the Debtors could draw on the syndicated line up to the total combined maximum indebtedness on the Capital One Line and the FTB Line (the "Syndicated Line"), provided that the principal balance on the Syndicated Line did not exceed sixty-five percent (65%) of the amounts owed on the commercial paper held by the Debtors. The amounts owed to each

8

lender would be based upon the percentage that each advanced on the Syndicated Line. On November 4, 2016, Capital One and FTB agreed to increase the maximum indebtedness under the Syndicated Line to $63M. Of this amount, $47M was advanced by Capital One, and $16M was advanced by FTB. Separate from the Syndicated Line, the Debtors also incurred an additional $10M in financing on March 25, 2016 from Ovation Finance Holdings 2, LLC ("Ovation") to finance business operations.

## REASONS FOR FILING

Throughout 2015, the Debtors' businesses were thriving. Having borrowed from Capital One for years, the Debtors had an amicable relationship with Capital One's loan officers and other decision makers. As the Debtors expanded and sold cars, Capital One increased the Capital One Line, and eventually the Syndicated Line, to profit off of the Debtors' sales. In or around early 2016, however, some of Capital One's officers left the company to form Ovation. Both Ovation and Capital One actively encouraged the Debtors to take on additional debt, through both an increase in the Syndicated Line and a separate high-interest $10M note from Ovation.

However, in late 2016, after encouraging the Debtors' expansion, Capital One's new management unilaterally decided that it wanted to exit the BHPH dealership space. This put the Debtors in a bind. They had borrowed substantial sums to finance dealership expansion in reliance on Capital One's representations, but now they were being forced to find ways to satisfy Capital One in a short time frame. This became increasingly difficult in January 2017, when Capital One refused to advance any additional sums on the Syndicated Line. Without access to this line, the Debtors had to revert to self-financing vehicles again. This put a large strain on their cash flow and dramatically limited their short-term sales volume, exacerbating the difficulty in finding a take-out lender for the Syndicated Loan.

The problem became worse in October 2017, immediately prior to the filing of the Debtors' bankruptcy petitions. As discussed above, the Debtors' financing through the Syndicated Line was based on the collateral value of the outstanding Contracts. The principal balance on the Syndicated Line was not to exceed sixty-five percent (65%) of the total receivables owed on the commercial paper.

The Debtors' used a centralized portfolio manager operating out of AUF's location to track their Contract receivables. Whenever a specific dealership sold a vehicle and assigned the Contract to its associated RFC, the dealership would record the receivable and report it to the portfolio manager. The portfolio manager would then aggregate these reported receivables and transmit this information to its lenders, including Capital One, upon demand.

In late September, the Debtors explored the option of selling a portion of their receivables to satisfy a portion of the debt owed on the Syndicated Line. It was during this process that they discovered an accounting error in their portfolio reporting that overstated the value of the receivables. This was caused due to inadvertent duplication of accounts associated with the same vehicle following repossessions or trade-ins.

To explain how the inadvertent error occurred, it is helpful to understand how the company treats repossessions and trades. When a dealership sells a vehicle subject to a Contract, a receivable is created and reported. If that customer defaults and the vehicle is repossessed, the RFC will then sell the vehicle back to the dealership for a commercially reasonable MMR Value, then it will charge off the account and not pursue a deficiency from the customer. The dealership then "refloors" the vehicle and places it back on the lot for sale to another customer. However, though the repo accounts are charged off, the dealerships neglected to remove the associated Contracts from their reports. Accordingly, after a vehicle was sold to a second customer, the

reports would still show both Contracts as valid receivables, even though the first account had been charged off. This same issue happened with trade-ins, where a customer would trade in an existing vehicle in satisfaction of the remaining obligations under the Contract with the RFC, then purchase a new vehicle under a new contract. The first contract, which had been satisfied through the trade in, was mistakenly still listed as a valid receivable. The Debtors have worked to rectify this issue going forward by tracking each Contract by the unique VIN. This will prevent future duplication in the reporting. But this did not happen prior to September 2017.

As soon as the Debtors discovered their mistake, they promptly reported the issue to Capital One. However, because the Debtors' had been mistakenly reporting charged off accounts for some time, the collateral value was less than previously reported. Rather than being worth approximately $90M, the true value was approximately $65M.

To be clear, the issue had nothing to do with the Debtors' mishandling of the collateral. The collateral was not impaired or declining in value due to the actions of the Debtors. Rather, it was simply inadvertently misreported. Now that the Debtors have a handle on the true value of the receivables, they intended to focus on consistently improving the collateral value, through additional sales and reduced expenses. Moreover, because Capital One cut off the Debtors from drawing on the Syndicated Line, every new vehicle that sells creates additional collateral for Capital One without a corresponding increase in the Capital One Line. Thus, the Debtors ongoing business operation will continue to improve Capital One's collateral position.

As a result of Capital One desiring to exit the "buy here pay here" space, it had no desire to work with the Debtors. Instead, Capital One recently filed a lawsuit seeking employment of a receiver to marshal and, if it so desired, liquidate its collateral. This would essentially force the Debtors' successful business to a screeching halt. And it would ensure that the Debtors' unsecured

11

creditors, including Ovation, would get nothing, and that the Debtors' 100+ employees would become unemployed.

The Debtors have a successful business model, even in the absence of the Syndicated Line. They are focused on finding a workable solution to pay off the Syndicated Line and the Ovation note, in full, within a reasonable period of time while adequately protecting Capital One and FTB through a continually improving collateral package. Capital One's actions in filing the lawsuit and seeking appointment of the receiver have prevented this solution. **It is the Debtors' full intent to propose a 100% plan in the near future.**

On October 17, 2017, to preserve its right to find a solution and pay all creditors in full, the Debtors decided to file for protection under Chapter 11 of the United States Bankruptcy Code. The Debtors anticipate using this process to deleverage their balance sheets, remove the pressure of Capital One's litigiousness, and shore up operations to provide a solution that satisfies all creditors.

## CONCLUSION

The Debtors have a proven business model, dedicated employees, and an excellent customer base. They now require the relief offered by the Bankruptcy Code in order to restructure their debt obligations and maintain operations. Based on the efforts of Capital One to shut the Debtors down and liquidate their collateral, Chapter 11 is the only option to preserve the business, assets and goodwill of the Debtors as a going concern.

Respectfully Submitted,

/s/ Ned Hildebrand
Griffin S. Dunham
Henry E. ("Ned") Hildebrand, IV
Alex Payne
DUNHAM HILDEBRAND, PLLC
1704 Charlotte Avenue, Suite 105
Nashville, Tennessee 37203
615.933.5851
ned@dhnashville.com
*Counsel for the Debtors*

**CERTIFICATE OF SERVICE**

On October 17, 2017, the foregoing was served via CM/ECF on all parties consenting to electronic service in this case, and by regular mail, email, or fax (as applicable) to (i) each Debtor's twenty largest creditors, (ii) the Office of the United States Trustee, and (iii) each Debtor's secured creditors.

/s/ Ned Hildebrand
Henry E. ("Ned") Hildebrand, IV